**IN THE COURT OF APPEALS OF IOWA**

No. 23-0730
Filed July 26, 2023

**IN THE INTEREST OF V.H.,**
**Minor Child,**

**D.H., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Linn County, Cynthia S. Finley, District Associate Judge.

A mother appeals the termination of her parental rights to her one-year-old daughter. **AFFIRMED.**

David R. Fiester, Cedar Rapids, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Julie F. Trachta of Linn County Advocate, Inc., Cedar Rapids, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Tabor and Greer, JJ.

**TABOR, Judge.**

"Maybe I'm just not cut out for this mom stuff." That was a Facebook post by V.H.'s mother—Danielle—who was upset that she couldn't provide the kind of party she wanted for her daughter's first birthday. One month after V.H. turned one, the juvenile court terminated Danielle's parental rights.[1] The court was concerned about the condition of Danielle's housing and her lack of insight into safe parenting practices. On appeal, Danielle contends that V.H. could be returned to her custody and termination was not in the child's best interests given their bond. After our independent review, we reach the same outcome as the juvenile court.[2]

## I.      Facts and Prior Proceedings

Danielle tested positive for methamphetamine during her pregnancy with V.H.[3] After her birth in March 2020, V.H. "scored very high on the withdrawal assessment, showing signs for poor suction, she was jittery, poor sleep, and [there were concerns] that she would be taken home to an unsafe living environment." After discussions with the Iowa Department of Health and Human Services, Danielle consented to the removal of three-day-old V.H. from her custody. The court adjudicated V.H. as a child in need of assistance (CINA). And the department

---

[1] V.H.'s father consented to the termination of his parental rights.

[2] We review termination decisions de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). We will uphold an order when there is clear and convincing evidence of the statutory grounds for termination. *In re T.S.*, 868 N.W.2d 425, 434 (Iowa Ct. App. 2015). We give careful consideration to the juvenile court's factual findings and in-person observations, but we are not bound by them. *See In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). Our top priority is the child's best interests. *See In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (identifying safety and the need for a permanent home as the "defining elements" in the best-interests determination).

[3] Danielle testified that she never used methamphetamine and only tested positive because her then roommates "were all users of meth."

placed V.H. in family foster care, where she has remained throughout the CINA case.

In the summer after removal, the department noted Danielle's progress. Her substance-abuse evaluation did not recommend any treatment.[4] She participated in services to improve her parenting skills, secured full-time employment, and had transportation. So the department allowed her semi-supervised visitation with V.H. And viewing those positive steps, that August the juvenile court extended the permanency goal of reunification for four months.

But safe housing remained a challenge.[5] At the time of V.H.'s birth, Danielle was sharing a residence with drug users. Even when Danielle obtained different housing with her new boyfriend in December 2022, it was not livable space. The house was infested with mice, the water was turned off, and the ceiling had caved in upstairs. The department also learned that Danielle was unemployed and expecting a third child.[6]

In January 2023, Danielle and her boyfriend moved into an efficiency apartment. At first, the caseworker and guardian ad litem (GAL) were optimistic about their move; the apartment was clean and, although sparsely furnished, included items for V.H. and the expected baby. But as the weeks wore on, the apartment's condition declined. About a month later, the caseworker noticed that

---

[4] Her mental-health evaluation did recommend that she participate in ongoing therapy, which she did with some inconsistency

[5] This challenge was not new to Danielle. She placed her oldest child into a voluntary guardianship with the maternal grandmother in Alabama because she did not have adequate housing at that time.

[6] That child, K.W., was born in March 2023. He was removed from Danielle's custody one day after his birth. He is living in the same foster home as V.H. His custody is not at issue here.

Danielle had taken in some pets and clutter was accumulating. According to the GAL, there was "a definite odor of animal feces in the home" by March.[7] During a visit, the caseworker counted two adult cats and a litter of kittens. The worker also noticed "a rather large cage" on the floor, which Danielle claimed housed gerbils. Actually, inside were two rats, one of which escaped from captivity on occasion. In her testimony, Danielle acknowledged that none of the animals had seen a veterinarian. But she insisted that she did not allow V.H. to handle the rats. She also explained that she discovered the animals from posts asking for help in a Free Pets Group on Facebook.

Speaking of Facebook, two posts by Danielle stood out for the department and the juvenile court. First, the court was concerned that "[s]he posted a request on Facebook seeking someone to watch [V.H.] while she was in the hospital giving birth in March." And that "this was an open request to the general public." Second, in a post requesting funds to throw V.H. a birthday party, Danielle ventured that perhaps she was not "cut out" to be a parent.

After that March birthday party at the Pizza Ranch, the foster mother noticed bruising on V.H.'s face and reported it to the department. The caseworker thought the bruising looked like someone grabbed the child roughly by the cheeks. Danielle denied seeing any bruising, though it was visible after more than a week. She also suggested the marks may have come from V.H. tipping her car seat over on herself.

---

[7] The GAL also noted that child proofing the apartment was a challenge with the presence of the pets, their supplies, electrical cords, and other potential hazards.

In April, the juvenile court granted the State's petition to terminate Danielle's parental rights. She now appeals.

## II.    Analysis

## A.  Ground for Termination

The juvenile court based its termination ruling on paragraph (h) of Iowa Code section 232.116(1). To satisfy that ground, the State needed to prove by clear and convincing evidence:

> (1) [V.H.] is three years of age or younger.
> (2) [V.H.] has been adjudicated a [CINA] pursuant to section 232.96.
> (3) [V.H.] has been removed from the physical custody of [her] parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that [V.H.] cannot be returned to the custody of [her] parents as provided in section 232.102 at the present time.

Iowa Code § 232.116(1)(h) (2023); *see In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting "at the present time" to mean "at the time of the termination hearing").

Danielle only contests the fourth element, that V.H. could not be safely returned to her custody. She asserts that she had suitable housing. And she dismisses any concerns about the pets because "the situation was temporary." Overall, she disputes that she lacked insight into the hazards in the household. The State disagrees, pointing to the caseworker's testimony that Danielle showed little awareness of how the animals and home safety issues posed barriers to reunification with her now toddler.

Viewed in isolation, the concerns about the conditions of Danielle's apartment and her collection of pets may seem "trivial" or "nebulous." *See In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014). "Yet this evidence needs to be put in the appropriate context." *Id.* Danielle had a history of unstable housing. And even after she secured a suitable apartment, she filled it with animals, oblivious of their origins or vaccination status. Like the juvenile court, we agree with the case professionals who viewed Danielle's bad judgment in this situation as emblematic of her inability to safely parent V.H.

On top of the housing issues, she had an ongoing need for mental-health therapy, but she was inconsistent with engaging in services. The department reported Danielle told her provider that she didn't need therapy because she could talk to her new boyfriend. We also share the GAL's concern over Danielle's lack of discretion in posting on Facebook, soliciting "random volunteers" to watch V.H. while she gave birth. The GAL also noted "a lack of parenting insight" from Danielle's denials when asked about the bruising on V.H.'s face.

The record shows that V.H. could not be returned to Danielle's custody at the time of the termination hearing. We thus find the State presented clear and convincing grounds for termination under paragraph (h).

**B. Best Interests/Close Bond**

Having determined that a statutory ground for termination exists, we turn to the question of what's in V.H.'s best interests. *See In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012). In doing so, we primarily consider her safety, the best placement for furthering her long-term nurturing and growth, and her physical, mental, and emotional condition and needs. Iowa Code § 232.116(2). We also consider the

child's integration into their foster family.  *Id.* § 232.116(2)(b).  Taking these factors into account, we conclude termination is in V.H.'s best interests.  V.H. has never lived with Danielle.  In fact, she's been out of parental custody for more than one year.  And she is comfortable with her foster parents, who are willing to adopt.

Danielle argues that termination is not in her daughter's best interests because of their close bond.  She recognizes that this distinct argument arises under Iowa Code section 232.116(3)(c), where it is her burden to prove by clear and convincing evidence that "termination would be detrimental to the child at the time due to the closeness of the parent-child relationship."  *See In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021).  And if she meets that burden, we still must decide whether the exception should preclude termination.  *In re C.A.*, No. 13-1987, 2014 WL 1234470, at *3 (Iowa Ct. App. Mar. 26, 2014).

We credit Danielle's testimony that she and V.H. are bonded.  She described her daughter's reaction at visits: "She gets all smiley and happy, and she tries to pull herself up out of the car seat."  But Danielle did not show that ending their legal relationship will harm V.H.  *See In re B.B.*, No. 22-1816, 2023 WL 3335868, at *8 (Iowa Ct. App. May 10, 2023) (Tabor, J., dissenting) (stating that "[t]wo questions drive the analysis" of this exception: "How close was their bond?  And will the child be harmed by severing that bond?"); *In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (concluding the exception in section 232.116(3)(c) did not preclude termination where the children were young, had been out of the mother's care for almost two years, and had achieved stability out of her home).

Thus, termination was proper.

**AFFIRMED.**